#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE WESTERN DISTRICT OF VIRGINIA
#### BIG STONE GAP DIVISION

| | |
|---|---|
| **MARCEI STOKES WILLIAMS,** ) | |
|    Plaintiff ) | |
| ) | Civil Action No. 2:19cv00008 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] ) | |
| **Commissioner of Social Security,** ) | By:  P<small>AMELA</small> M<small>EADE</small> S<small>ARGENT</small> |
|    Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Marcei Stokes Williams, ("Williams"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted as the defendant in this case pursuant to F<small>ED</small>. R. C<small>IV</small>. P. R<small>ULE</small> 25(d).

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Williams protectively filed her application for DIB on June 23, 2015, alleging disability as of November 16, 2015,[2] based on degenerative disc disease; carpal tunnel syndrome in the left hand involving the forearm; carpal tunnel syndrome in the right hand; seizures; Bell's palsy; diabetes; high cholesterol; high blood pressure; vitamin D deficiency; acid reflux disease; back pain; and memory problems. (Record, ("R."), at 13, 154-55, 175, 191.) The claim was denied initially and upon reconsideration. (R. at 77-79, 83-85, 88-91, 93-95.) Williams then requested a hearing before an administrative law judge, ("ALJ"). (R. at 96-97.) The ALJ held a hearing on December 11, 2017, at which Williams was represented by counsel. (R. at 28-51.)

By decision dated April 9, 2018, the ALJ denied Williams's claim. (R. at 13-22.) The ALJ found that Williams met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 15.) The ALJ found that Williams had not engaged in substantial gainful activity since November 16, 2015, the amended alleged onset date.[3] (R. at 15.) The ALJ

---

[2] Williams initially alleged a disability onset date of October 15, 2014; however, she amended her onset date to November 16, 2015, at her hearing. (R. at 31, 154.)

[3] Therefore, Williams must show that she was disabled between November 16, 2015, the alleged onset date, and April 9, 2018, the date of the ALJ's decision, in order to be eligible for

-2-

determined that Williams had a severe impairment, namely epilepsy, but he found that Williams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ found that Williams had the residual functional capacity to perform light[4] work that required no more than occasional balancing and climbing and frequent stooping, kneeling, crouching and crawling; that required no more than frequent handling, fingering and feeling with the right hand; and that did not require her to work around hazards, such as machinery and unprotected heights. (R. at 17.) The ALJ found that Williams was able to perform her past work as a waitress. (R. at 20.) In addition, based on Williams's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Williams could perform, including the jobs of a cafeteria attendant, a cashier II and a checker. (R. at 21-22.) Thus, the ALJ concluded that Williams was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(f), (g) (2019).

After the ALJ issued his decision, Williams pursued her administrative appeals, (R. at 151, 237-38), but the Appeals Council denied her request for review. (R. at 1-5.) Williams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Williams's motion for summary judgment filed July 19, 2019, and the Commissioner's motion for

---

benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

summary judgment filed August 16, 2019.

## II. Facts

Williams was born in 1965, (R. at 154), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). She has a high school education and past work experience as a cook, a kitchen helper, a waitress and a cashier. (R. at 45-46, 176.) Williams testified at her hearing that her seizures were under control. (R. at 36.) She stated that she experienced numbness, tingling and burning in her feet due to diabetic neuropathy. (R. at 36-37.) Williams stated that she had difficulty walking and standing. (R. at 37.) She stated that she could stand up to 15 minutes without interruption; walk up to 30 minutes without interruption; and sit up to 30 minutes without interruption. (R. at 37, 44.)

Mark Hileman, a vocational expert, also was present and testified at Williams's hearing. (R. at 45-50, 221.) Hileman testified that a hypothetical individual of Williams's age, education and work history, who had the residual functional capacity to perform light work, who could occasionally balance and climb and frequently handle, finger and feel with the right hand, and who should avoid hazards, such as machinery and unprotected heights, could perform Williams's past work as a waitress. (R. at 46-47.) He stated that such an individual also could perform other work that existed in significant numbers, including jobs as a cafeteria attendant, a cashier II and a checker. (R. at 47-48.) Hileman then was asked to consider the same hypothetical individual, but who would be off task 20 percent of the workday; who could stand no more than 15 minutes at a time; and who could walk and/or sit no more than 30 minutes at a time. (R. at 48.) He stated

that there would be no jobs available that this individual could perform. (R. at 48.) Hileman stated that, should the hypothetical individual be limited to only occasional reaching, handling and fingering with the dominant upper extremity, the jobs previously identified would be eliminated. (R. at 49.)

In rendering his decision, the ALJ reviewed medical records from Dr. Thomas M. Phillips, M.D., a state agency physician; Dr. Jameson Buston, M.D., a state agency physician; Holston Valley Medical Center; Holston Medical Group; Associated Neurologists of Kingsport; Mountain States Medical Group, ("Mountain States"); Wellmont Medical Associates; and Dermatology Associates.

Williams had a history of seizures as a child. (R. at 263.) On September 24, 2014, Williams stated that she got sick after eating breakfast and then lost consciousness with shaking. (R. at 263, 297.) Dr. David Morin, M.D., a physician with Holston Medical Group, diagnosed grand mal seizure and prohibited Williams from driving. (R. at 265.) On September 25, 2014, an MRI of Williams's brain showed questionable mesial temporal sclerosis on the left and microvascular disease, which was mildly prominent for her age. (R. at 248-49, 304.) That same day, Williams had an abnormal electroencephalogram, ("EEG"), due to bursts of bilateral bifrontal slowing and intermittent left and right frontotemporal sharp contoured wave, possibly associated with seizure disorder. (R. at 251-54, 305.)

On September 29, 2014, Dr. R. Scott Macdonald, M.D., a neurologist with Associated Neurologists of Kingsport, saw Williams upon Dr. Morin's referral. (R. at 297-301.) Williams complained of fatigue, gastroesophageal reflux, ("GERD"), neck pain, headaches and diabetes mellitus, type 2. (R. at 298.) Williams denied back pain, anxiety and depression. (R. at 298.) Dr. Macdonald reported that

Williams had normal coordination; her gait, station and sensation were normal; she had normal concentration and attention span; her muscle bulk, tone and strength were normal; she had no involuntary movement in the upper and lower extremities; she had age-appropriate fund of knowledge; her speech and language were intact; and she had a normal mood and affect. (R. at 299-300.)

On October 13, 2014, Williams denied having further seizures. (R. at 293.) Dr. Macdonald reported that Williams's rapid alternating movements were normal in her upper and lower extremities; she had normal coordination; her gait, station and sensation were normal; she had normal concentration; her muscle bulk, tone and strength were normal; she had no involuntary movement in the upper and lower extremities; she had age-appropriate fund of knowledge; and her speech and language were intact. (R. at 294-95.)

On December 8, 2014, Williams established care at Wellmont Medical Associates for treatment of diabetes, hypertension and seizures. (R. at 340-45.) Williams reported that she had not had a seizure since October 2014. (R. at 340.) Williams denied joint swelling, gait problems, behavioral problems, decreased concentration and agitation. (R. at 343.) Sallie H. Lively, N.P., a nurse practitioner, reported that Williams had normal range of motion of her neck and musculoskeletal system; she had normal strength and reflexes; and her mood, affect and behavior were normal. (R. at 343-44.) Lively diagnosed diabetes mellitus, elevated cholesterol, seizures and seasonal allergies. (R. at 344.)

On March 23, 2015, Williams reported mild muscle pain, tingling and numbness in her feet when walking on a treadmill. (R. at 346.) Lively noted that Williams's hyperlipidemia and hypertension were controlled. (R. at 347.) Williams

had normal range of motion of her neck and musculoskeletal system; she had normal strength and reflexes; her diabetic foot exam revealed no abnormal sensation, blisters, calluses, diabetic ulcers or sensory impairment; and her mood, affect and behavior were normal. (R. at 349-50.) Lively diagnosed dyslipidemia; vitamin B deficiency; benign essential hypertension; reflux; and controlled diabetes mellitus, type II, without complication. (R. at 350.)

On April 27, 2015, Williams saw Dr. Christopher A. Pendola, M.D., a neurologist with Mountain States. (R. at 310-13.) Williams reported that she was doing well and had not had any seizures since starting her medication. (R. at 310.) Dr. Pendola reported that Williams's motor strength was normal in all four extremities; she had no atrophy of the upper or lower extremities; she had intact sensation; her gait and station were within normal limits; and her reflexes were symmetric and age appropriate. (R. at 312.) He diagnosed epilepsy and left-sided mesial temporal sclerosis. (R. at 312.) Dr. Pendola limited Williams from driving within six months of a seizure, and she was not to work around a hot stove or open flame, to take a bath or to undertake any other activity that would be dangerous, if she had another seizure. (R. at 36, 312.)

On September 8, 2015, Dr. Pendola reported that Williams's short- and long-term memory were intact; her mood and affect were normal; her speech was fluent and clear; her facial sensation was normal; she had no facial palsy/weakness; her motor strength was normal in all four extremities; she had no atrophy of the upper or lower extremities; she had intact sensation; her gait and station were within normal limits; and her reflexes were symmetric and age appropriate. (R. at 320-21.) Dr. Pendola diagnosed epilepsy, well-controlled, and left-sided mesial temporal sclerosis. (R. at 321.) On September 23, 2015, Lively reported that

Williams had normal range of motion of her neck and musculoskeletal system; she had normal strength and reflexes; her diabetic foot exam revealed no abnormal sensation, blisters, calluses, diabetic ulcers or sensory impairment; and her mood, affect and behavior were normal. (R. at 355-56.)

On February 1, 2016, Dr. Thomas M. Phillips, M.D., a state agency physician, found that Williams had no exertional limitations. (R. at 57-59.) He opined that Williams had an unlimited ability to climb ramps and stairs, balance, stoop, kneel crouch and crawl and that she should never climb ladders, ropes or scaffolds. (R. at 58.) No manipulative, visual or communicative limitations were noted. (R. at 58.) Dr. Phillips found that Williams should avoid moderate exposure to hazards, such as machinery and heights. (R. at 58.)

On March 23, 2016, Williams complained of mild back pain that was aggravated by bending and twisting. (R. at 358-64.) Williams's examination findings remained unchanged. (R. at 362.) Melissa D. Smith, F.N.P., a family nurse practitioner with Wellmont Medical Associates, diagnosed controlled diabetes mellitus, type II, without complication; acute low back pain; chronic GERD without esophagitis; dyslipidemia; and hypertension. (R. at 363.) On April 1, 2016, Dr. Pendola reported that Williams had no facial palsy or weakness; she had normal motor strength and tone in all extremities; her sensation was intact; her gait and station were normal; and her reflexes were symmetric and age appropriate. (R. at 438.) Dr. Pendola diagnosed epilepsy, well-controlled, and left-sided mesial temporal sclerosis. (R. at 439.)

On May 19, 2016, Dr. Sung-Joon Cho, M.D., examined Williams at the request of Disability Determination Services. (R. at 335-38.) Williams reported

that she had not had a seizure since September 2014 and that her driving restriction had been lifted. (R. at 335-36.) Williams reported that she was independent with her activities of daily living; she could perform some household chores, such as light dusting, sweeping and washing dishes; and she had difficulty climbing stairs. (R. at 336.) She reported that she occasionally had some right hand pain and numbness. (R. at 336.) Dr. Cho reported that Williams had full grip strength in both hands; her coordination, station and gait were normal;[5] her straight leg raising tests were negative; she had normal motor function in the upper and lower extremities; she had a positive Phalen's test on the left; she had full range of motion throughout; her deep tendon reflexes were normal; she had intact sensation; her affect, thought content, memory and general fund of information were normal; and she could perform fine and gross manipulation. (R. at 337.) Dr. Cho diagnosed seizure, well-controlled, and history of right carpal tunnel, status post-surgery. (R. at 337.) Dr. Cho opined that Williams could occasionally lift and carry items weighing up to 30 pounds and frequently 10 pounds; she could stand and walk four to six hours in an eight-hour workday with no limitations on sitting; she could occasionally climb and balance and frequently stoop, kneel, crouch and crawl; she could frequently handle, finger and feel with the right hand and had no limitations on the left hand; and she should avoid working at heights and around heavy machinery. (R. at 338.)

On June 28, 2016, Dr. Jameson Buston, M.D., a state agency physician, opined that Williams experienced no exertional or nonexertional functional limitations. (R. at 69.)

---

[5] Dr. Cho noted that Williams had some weakness in her quads when doing a squat; thus, she had difficulty rising from a squatting position. (R. at 337-38.)

On September 23, 2016, Williams complained of severe, right shoulder pain and left hand pain. (R. at 365-73.) Williams had normal range of motion of her neck; she had decreased range of motion, tenderness, bony tenderness and pain in her right shoulder; she had normal strength, reflexes, sensation, muscle tone and coordination; and her mood, affect, behavior, speech, judgment, thought content, cognition and memory were normal. (R. at 370-71.) X-rays of Williams's right shoulder showed calcific tendinosis – hydroxyapatite deposition disease. (R. at 412.) Smith diagnosed right shoulder pain, unspecified chronicity, and left hand contracture. (R. at 372.)  On October 5, 2016, Williams reported that her seizures were well-controlled. (R. at 434.) Williams's examination findings remained unchanged. (R. at 435.) Dr. Pendola diagnosed epilepsy, well-controlled, and left-sided mesial temporal sclerosis. (R. at 435-36.)

On January 4, 2017, Williams complained of right shoulder pain. (R. at 463-71.) Williams had normal range of motion of her neck; she had decreased range of motion, tenderness and pain in her right shoulder; she had normal reflexes, sensation, muscle tone and coordination; and her mood, affect, behavior, speech, judgment, thought content, cognition and memory were normal. (R. at 468.) Smith diagnosed GERD without esophagitis; hypertension; dyslipidemia; sinusitis; right shoulder pain, unspecified chronicity; and diabetes mellitus, type II. (R. at 469-70.)

On March 29, 2017, Williams complained of headaches. (R. at 430-33.) Williams's examination findings remained unchanged. (R. at 431-32.) Dr. Pendola diagnosed epilepsy, well-controlled; left mesial temporal sclerosis; and tension headaches. (R. at 430.) He ordered an MRI of Williams's head. (R. at 430.) On April 5, 2017, Smith reported that Williams had normal range of motion of her neck; she had decreased range of motion, tenderness and pain in her right shoulder;

she had normal reflexes, sensation, muscle tone and coordination; her diabetic foot exam revealed no abnormal sensation, blisters, calluses, diabetic ulcers or sensory impairment; and her mood, affect, behavior, speech, judgment, thought content, cognition and memory were normal. (R. at 477.) On July 12, 2017, Williams complained of right shoulder pain. (R. at 487-95.) Smith reported that Williams had normal range of motion of her neck; she had decreased range of motion, tenderness and pain in her right shoulder; she had normal reflexes, sensation, muscle tone and coordination; her diabetic foot exam revealed no abnormal sensation, blisters, calluses, diabetic ulcers or sensory impairment; and her mood, affect, behavior, speech, judgment, thought content, cognition and memory were normal. (R. at 492.)

On September 11, 2017, Williams reported intermittent right hand numbness involving her index finger, thumb and, at times, middle finger and right wrist pain. (R. at 426.) Dr. Pendola reported that Williams's examination findings remained unchanged. (R. at 424-25.) Dr. Pendola diagnosed epilepsy, left-sided mesial temporal sclerosis, tension-type headaches and right hand numbness. (R. at 424.) He ordered an electrodiagnostic study to evaluate Williams's right hand numbness. (R. at 423.) On September 14, 2017, an electromyography, ("EMG"), and neurography, showed mild median nerve mononeuropathy at the right wrist – mild carpal tunnel syndrome. (R. at 427-29.)

On October 19, 2017, Smith completed a medical assessment, indicating that Williams could occasionally lift and carry items weighing up to 20 pounds and 10 pounds frequently; she could stand and/or walk a total of four to five hours in an eight-hour workday, and she could do so two to three hours without interruption; she could sit a total of four hours in an eight-hour workday, and she could do so up

to one hour without interruption; she could occasionally stoop, kneel, balance, crouch and crawl and never climb; she could not push and pull items weighing more than 20 pounds with her right upper extremity; and she could not work around heights. (R. at 458-59.)

That same day, Smith completed a mental assessment, indicating that Williams had an unlimited ability to follow work rules, to relate to co-workers and to maintain personal appearance. (R. at 461-62.) She opined that Williams had a satisfactory ability to deal with the public; to use judgment with the public; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out complex, detailed and simple job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 461-62.) Smith found that Williams had a seriously limited, but not precluded, ability to deal with work stresses and to function independently. (R. at 461.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Williams argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-11.) Williams argues that the ALJ failed to properly meet his step four and five burdens of determining whether her impairments prevented performance of past relevant work and in identifying other work that she could perform. (Plaintiff's Brief at 8.) She further argues that the ALJ failed to properly consider and evaluate the opinions of Dr. Cho and nurse practitioner Smith. (Plaintiff's

Brief at 8-11.) Williams contends that the ALJ failed to provide support for rejecting Smith's opinion regarding her ability to deal with work stresses and to function independently. (Plaintiff's Brief at 8-9.) She also contends that the ALJ failed to address the standing and walking limitations assessed by Dr. Cho. (Plaintiff's Brief at 8-10.)

The ALJ found that Williams had the residual functional capacity to perform light work that required no more than occasional balancing and climbing and frequent stooping, kneeling, crouching and crawling; that required no more than frequent handling, fingering and feeling with the right hand; and that did not require her to work around hazards, such as machinery and unprotected heights. (R. at 17.) In making this residual functional capacity finding, the ALJ stated that he was giving "great weight" to the opinion of Dr. Cho, who opined that Williams could occasionally lift and carry items weighing up to 30 pounds and 10 pounds frequently; she could stand and walk four to six hours in an eight-hour workday with no limitations on sitting; she could occasionally climb and balance and frequently stoop, kneel, crouch and crawl; she could frequently handle, finger and feel with the right hand, and she had no limitations on the left hand; and she should avoid working at heights and around heavy machinery. (R. at 18-19, 338.) The ALJ noted that Dr. Cho examined Williams, and his examination report supported his opinion. (R. at 18.)

The ALJ also noted that he was giving "partial weight" to nurse practitioner Smith's opinion that Williams could occasionally lift and carry items weighing up to 20 pounds and 10 pounds frequently; she could stand and/or walk a total of four to five hours in an eight-hour workday, and she could do so two to three hours without interruption; she could sit a total of four hours in an eight-hour workday,

and she could do so for up to one hour without interruption; she could occasionally stoop, kneel, balance, crouch and crawl and never climb; she was unable to push and pull items weighing more than 20 pounds with her right upper extremity; and she could not work around heights. (R. at 19, 458-59.) The ALJ noted that Smith's assessment regarding Williams's ability to lift and carry, to engage in postural activities and to avoid heights was consistent with the record, including Dr. Cho's opinion. (R. at 19.) However, the ALJ noted that her opinion regarding Williams's ability to sit, stand and walk was not supported by the record. (R. at 19.)

As noted above, the ALJ found that Dr. Cho's examination report supported his assessment regarding Williams's physical residual functional capacity. (R. at 18.) The ALJ failed to address any areas of disagreement with Dr. Cho's assessment or written report. (R. at 18.) The ALJ failed to explain what, if any, weight that he was giving Dr. Cho's finding regarding Williams's standing and walking limitations. In addition, the ALJ rejected Smith's finding that Williams could stand and/or walk a total of four to five hours in an eight-hour workday and that she could do so for two to three hours without interruption because it was not supported by the record. (R. at 19, 458-59.) The ALJ made this finding despite previously noting Dr. Cho's assessment, which also placed limitations on Williams' ability to stand and walk. (R. at 18-19.)  The ALJ limited Williams to a light range of work activity without including any standing or walking restrictions. The ability to perform light work requires "a good deal of walking or standing." *See* 20 C.F.R. § 404.1567(b). Furthermore, Social Security Ruling 83-10, indicates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday. *See* Social Security Ruling, ("S.S.R."), 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1992). The ALJ's decision fails to accept or reject Dr. Cho's finding on Williams's

ability to stand and walk.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In assessing a claimant's residual functional capacity, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R., 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013)). The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p). Thus,

I do not find that substantial evidence exists to support the ALJ's finding regarding Williams's physical residual functional capacity.

Based on these findings, I will not address Williams's remaining arguments. An appropriate Order and Judgment will be entered remanding Williams's claim to the Commissioner for further development.

DATED:	August 26, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE